IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. __1:21-cv-02050_____

SHAIITARRIO BROWN and
BRITTANY KING,

    Plaintiffs,

v.

DENVER, COLORADO, a municipality, and
JOHN AND JANE DOES, whose true names are unknown, Denver Police Department officers and supervisors, in their individual and official capacities,

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs, Shaiitarrio Brown and Brittany King, submit the following Complaint and Jury Demand against Defendants.

### JURISDICTION

1. This action arises under a federal statute, 42 U.S.C. § 1983.

### JURY DEMAND

2. Under Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial on all issues so triable.

### BACKGROUND

3. One part of the background for this case is the nationwide public outcry and demonstrations precipitated by Minneapolis police officers murdering George Floyd.

4. Mr. Floyd's murder, in turn, resulted from long-standing police racism in too many officers and agencies, particularly racism targeting African American men.

5. Denver experienced its most intense George Floyd Protests ("GFP") from May 28 to May 31, 2020 in and around Civic Center Park, the 16th Street Mall, and the Broadway/Lincoln Corridor between 8th Avenue and the Colorado State Capitol Building.

6. During these local GFP, the Denver Police Department ("DPD") targeting bystanders, peaceful protesters, journalists, and medics, aiming rubber bullets at people's faces, etc. has been thoroughly documented, including in class-action court documents filed in federal district court by attorney Milo Schwab.[1] (Ex. 1.)

7. This led to an unprecedented temporary restraining order effectively barring the DPD from using less-lethal tactics and weapons on demonstrators.

8. In his order, Judge R. Brooke Jackson candidly stated that he found some of the DPD's conduct "disgusting," and that the DPD "failed in its duty to police its own." (Ex. 2 at 4, 9).

9. Video of officers shooting pepperballs at Mr. Brown and Ms. King was cited in these court documents as evidence supporting the temporary restraining order.[2] (Ex. 1 at 13.)

10. Among the many witnessed and recorded abuses in Mr. Schwab's pleadings, one stands out to Mr. Brown and Ms. King because, as detailed below, it is how their incident ("the

---

[1] Case number 1:20-cv-01616-RBJ.
[2] "Pepperball launchers are air-powered devices [resembling paintball guns] that deploy plastic sphere rounds containing either inert powder or pelargonic acid vanillylamide ('PAVA') powder. They fire the PAVA rounds at a velocity of 280-320 feet per second and the inert rounds at 280-350 feet per second. PAVA powder is a chemical agent that can cause impaired breathing, skin inflammation, tightness and pain in the chest, involuntary eye closure, profuse tearing, secretion of excessive mucous, involuntary extension of one's hands to the face, and anaphylactic shock." (Ex. 3 at 13.)

incident") began: police indiscriminately shooting at people for no reason in a perverse game of cat and mouse.

11. Numerous witnesses described some version of "police in riot gear, hanging off of vans, driving around shooting protestors. It was almost as if police were playing a game of hide and seek, only when they found someone they shot at them." (Ex. 1 at 14.)

12. A second part of the background of this case is that at the time of the incident Mr. Brown and Ms. King were unhoused. They drove for work, they worked to be able to afford a motel room for the night, and if they could not afford a motel room, they had to sleep in their car.

13. A third piece of the background is that Mr. Brown is an African American man.

## FACTS

14. The victims in this case are 26-year-old Shaiitarrio Brown, 31-year-old Brittany King, who was 19 weeks pregnant at the time of the incident, and their now infant daughter, who was born on October 24, 2020.

15. Around 1:00 a.m. on May 30, 2020, Mr. Brown and Ms. King were driving for DoorDash near Denver's Civic Center Park.

16. They were not part of the GFP, and certainly were not rioting.

17. They were simply working, trying to earn enough money to avoid living in their vehicle.

18. They drove lawfully on open public roads.

19. The nearest protests were blocks away.

20. Mayor Hancock's curfew was not yet in effect, and would not go into effect for another 19 hours.

21. Plaintiffs had just picked up food for delivery to an apartment complex off of Speer Boulevard when an officer playing cat and mouse randomly shot their car with a pepperball in an unprovoked attack.

22. Mr. Brown got out of the car to ask nearby police why they shot at him and Ms. King, and to object to police shooting at them. He yelled to officers, for example, "You just shot a car with a pregnant woman in it!" (Ex. 4 at 2:33:29.)

23. This is where video of the incident, taken by a bystander, picks up. (Ex. 4 at 2:33:20.)

24. Mr. Brown is approximately 40 feet away from officers.

25. He does not approach officers.

26. He does nothing that is physically aggressive.

27. His empty hands are visible.

28. He repeatedly yells out to officers that Ms. King is in the car and is pregnant.

29. The officers look bored, not threatened; there is almost no one around.

30. Then officers shoot. They shoot dozens of pepperballs at a non-violent African American man and a pregnant woman.

31. They shoot pepperballs at Mr. Brown's face in violation of how this ordnance is required to be used. (The PepperBall® manuals warns, "Danger: Never aim or shoot at the head, face, eyes, ears, throat or spine. Impact in these areas could result in unintended or permanent injury or death." (Ex. 5 at 4.))

32. Even after Mr. Brown is back in the car trying to drive away officers continue shooting pepperballs.

33. At least one pepperball hit Mr. Brown in the face. (Ex. 6.)

4

34. At least three hit Ms. King in the abdomen through an open window she was frantically trying to close.

35. Plaintiffs' dog, Knicks, was in the back seat and also got shot. Knicks had chemical burns on her nose, paws, and inside her ears. The chemicals caused her to lose fur. (Ex. 7.)

36. Mr. Brown suffered lacerations and bruising.

37. Ms. King suffered a broken right hand, chemical burns, bruises, and repeated shots to her stomach. (Ex. 8.)

38. Plaintiffs' car – in essence their home – was totaled because the pepperball chemicals got everywhere and were impossible to get out. (Ex. 9.)

39. The bystander video of the incident has now been viewed approximately 18 million times on Twitter and became a national news item.

40. This caused both Mr. Brown and Ms. King significant emotional distress.

41. No expecting mother, for example, wants to Google "Denver police shoot pregnant woman" and have her face and life come up in multiple languages.

42. Ms. King sought emergency medical care from an ambulance crew near the scene of the incident.

43. Ms. King was then hospitalized twice for pregnancy complications, including severe cramping, elevated and then depressed fetal heart rate, chemical burns on her throat and lungs, and extreme dehydration from pain during eating and drinking due to the burns. In other words, the chemical burns hurt too much for her to swallow water.

44. Ms. King's blood tests during these hospitalizations showed high levels of various chemicals from the pepperballs.

45. Several of these chemicals, Ms. King's doctors told her, are known to cause loss of pregnancy.

46. The PepperBall® manual itself states, "Warning: this product contains chemicals known…to cause…birth defects or other reproductive harm." (Ex. 5 at 3.)

47. Sadly, Mr. Brown and Ms. King's child is starting to show pronounced developmental delays. At nine months old she is not yet crawling, and only just learned how to hold her bottle by herself. She was also born with some physical differences, including one leg significantly shorter than the other.

48. DPD Chief Paul Pazen referred the incident to internal affairs.

49. 14 months later, internal affairs has yet to complete its investigation.

50. Despite repeated requests from Plaintiffs' counsel, the DPD will not release any records from either the incident or the internal affairs investigation.

## MUNICIPAL ALLEGATIONS

**Failure to Train**

51. The Denver Office of the Independent Monitor ("OIM") is the DPD's civilian oversight body.

52. Its responsibilities include making recommendations on DPD policy and investigating and publicly reporting on certain complaints against law enforcement.

53. Acting on a unanimous request from the Denver City Council, the OIM issued its report, The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review (the "Report"), on December 8, 2020. (Ex. 3.)

54. The OIM's data review was exhaustive, including dozens of interviews, thousands of documents, and hundreds of hours of video and audio recordings.

55. The Report is thus the only comprehensive and reliable study on the DPD during the GFP.

56. As discussed more below, the Report generally concludes that the DPD's response to the protests was chaotic, below standards set by national best practices, and often far too violent.

57. The Report, for example, cites several failure-to-train issues that caused the incident in this case.

58. First, the DPD was simply unready to Constitutionally police an event like the GFP.

> Best practices emphasize the importance of crowd control and field force operations training to prepare officers to effectively respond to mass demonstrations. Such training helps officers coordinate their movements along skirmish lines, maintain officer and community safety, de-escalate potential confrontations, *and only judiciously use less-lethal munitions in crowd control situations, if necessary*. Officers should receive this training as recruits and in regular refresher courses throughout their careers. Team leaders, supervisors, and commanders should also receive initial and refresher training to ensure that they can lead the officers under their command in effective *and Constitutional* policing during mass protests.
>
> During interviews, DPD personnel often brought up their desire to receive additional crowd control and field force operations training…Some also expressed a perception that there has been less attention to crowd control training in recent years and noted that the time for such training often conflicts with the demands of normal patrol duties. During [its] review, [the OIM] examined training records produced by the DPD's Training Academy, which revealed there has been a decline in the volume and frequency of crowd control and field force training in recent years…[C]rowd control skills are perishable, officers are not normally required to use them during patrol, and the consequences of being caught unprepared can be severe.

(Ex. 3 at 51, emphasis added.)

7

59. It is striking that during an official probe by the OIM, members of the DPD themselves said that their Department "has not made enough recent investment in crowd control and field force operations training to properly prepare officers" for the GFP. (Ex. 3 at 2.)

60. Second, but similarly, DPD personnel are untrained to work mass protests *about policing*.

> Recent research has demonstrated that, in general, police tend to respond to demonstrations about police brutality more aggressively than they do to protests with other messages, making arrests and using force at greater rates…[P]rotests about police conduct also pose a risk that officers will seek to punish protestors for speech that officers find offensive or objectionable. Given that risk, [the OIM] believe[s] that police departments must implement tighter internal controls on the use of force during protests that are about police conduct…[The OIM does] not believe that the DPD sufficiently met that challenge during the GFP.

(Ex. 3 at 11.)

61. Underscoring this issue, Mr. Brown was shouting his complaint about police randomly shooting Plaintiffs' car with a pepperball before DPD officers opened fire on him and Ms. King.

62. There is a telling moment just before officers shoot. Mr. Brown effectively yells, "There's a pregnant woman in this car, you wouldn't dare shoot at it!" (Ex. 4 at 2:33:40.)

63. The officers forget their role as professional law enforcement. Like someone being challenged to a bar fight, they seem to take this as an unacceptable questioning of their dominance and authority. It is exactly this moment that they start shooting.

64. In other words, they shoot because Mr. Brown (rhetorically) invites them to shoot as part of his protest, not because the situation requires it.

65. Third, during the GFP, DPD leadership gave officers little to no briefing, training, or direction on tactical goals.

66. Officers:

    Sometimes did not even know who the appointed Operations Chief was on particular days. They sometimes reported a lack of clarity about their strategic objectives, which led to confusion about when to advance on, retreat from, or hold specific pieces of downtown. *This concern was so strongly voiced by DPD personnel that [the OIM] believe[s] it merits specific scrutiny by the DPD to ensure that it is addressed before future protests.*

    (Ex. 3 at 50, emphasis added.)

67. During mass demonstrations, a lack of law enforcement strategic clarity – and failing to communicate with and train officers on strategic objectives – is an invitation to disorganized, inappropriate, and unconstitutional policing, as became clear in many instances of DPD brutality during the GFP.

68. For Mr. Brown and Ms. King, there was almost no one around them when police started shooting.

69. It is hard to see any strategic need, or any need at all, for police to remove Plaintiffs from the area, especially with such a high level of force as that shown in the video of the incident.

70. Fourth, many DPD officers at the GFP shot pepperballs without being trained or certified to do so.

    The OIM analyzed the Use of Force Statements produced by the DPD and found that there were five officers who stated that they were given "training" on the pepperball or [other less-lethal munitions] when they arrived to the GFP. For example, one officer indicated that on May 30, "upon arrival to the meeting point near the Capitol Building, I was given training for the Pepper Ball launcher due to the emergency situation, and as we did not have enough Officers who had the certification." [3] Other officers also stated that they were given "emergency field training" when they began working at the GFP, and none was on the Certified Officer List. The OIM also identified other instances in which officers stated that

---

[3] May 30, 2020 was the same day as Plaintiffs' incident.

> they had used pepperball…during the first five days of the GFP, but they did not appear on the Certified Officer List.

(Ex. 3 at 29.)

71. As the DPD declines to release records of the incident, Plaintiffs do not know if officers involved lacked pepperball training. Enough officers firing pepperballs on May 30, 2020 were untrained, though, that Plaintiffs should get to test this claim.

72. If DPD officers were trained on responding to mass protests and protests about policing, if they had tactical direction, and if they were trained on the proper use of pepperballs, the incident in this case would not have happened.

**Policy**

73. Pepperballs are:

> A hybrid of a chemical munition and an impact projectile. [They] can be used in two ways: area saturation and direct fire. When used for area saturation, pepperballs are shot at the ground or other hard surfaces, causing the rounds to release a cloud of the chemical agent near a person or persons. When direct fired, the rounds are shot directly at subjects, exposing them to both the pain of impact and the effects of chemical exposure. During area saturation, pepperball functions as a chemical munition; when direct fired, it is both a chemical munition and an impact projectile. During [the OIM's] review of hundreds of hours of [body-worn camera] video from the GFP, [the OIM] identified many examples of pepperball being used in both ways by DPD officers.
>
> Notwithstanding pepperball's hybridity, the DPD has a single standard for its use: defensive resistance. The DPD Use of Force Policy defines defensive resistance in crowd control situations as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic." This means that an officer may strike a person directly with pepperball in response to nothing more than disrupting traffic. [The OIM] believe[s] that striking someone directly with an impact projectile that could cause them serious harm during crowd control should be reserved for situations in which individuals are engaging in no less than active aggression, defined as "an overt act or threat of an assault, coupled with the present ability to carry out the action, which reasonably indicates that an assault or injury to a person is likely."

10

(Ex. 3 at 36-37.)

74. During the incident Plaintiffs stopped their car in the street.

75. Mr. Brown and Ms. King were non-violent and showed nothing like active aggression, but approximately six cars passed them while they were parked and before they moved from the area.

76. Plaintiffs may have been disrupting traffic, and officers may therefore have been within policy to shoot pepperballs directly at them.

77. This policy thus caused Plaintiffs' Constitutional deprivations.

**Custom: DPD's Extreme and Uncontrolled Use of Pepperballs**

78. Throughout the GFP, including in the incident with Plaintiffs, the specific ways the DPD approached it use of pepperballs were so excessive, but also so common among officers, that they amounted to a DPD custom.

79. This custom can be summarized as "shoot a lot of pepperballs, shoot them often, and aim them anywhere, everywhere, and nowhere."

80. This custom had several aspects. The first was stockpiling huge amounts of pepperballs.

81. When the GFP began:

> The DPD had more than 30,000 PAVA and inert pepperball rounds…On May 28, a large number of officers deployed with less-lethal equipment, and hours after the protests had begun, DPD officers began reporting that they had exhausted their supplies of less-lethal munitions…On the second day of the GFP, the DPD began purchasing additional munitions directly from its vendors while continuing to request resupply from neighboring jurisdictions. Specifically, between May 29 and June 1, the DPD ordered an additional 66,000 pepperball rounds [at a cost of $153,080], *which was more than three times the amount it had in inventory at the start of the protests*. It also ordered 7,875 inert pepperball rounds…In interviews, DPD personnel also described receiving unknown amounts of less-lethal munitions from Mutual Aid Partners.

(Ex. 3 at 1, emphasis added.)

82. Second:

    > The DPD did not effectively track its less-lethal munitions during the GFP. As munitions were exhausted and new supplies were obtained, they were generally distributed…to supervisors, who would then dispense them to the officers under their command. Yet, the DPD maintained no log of these munitions, nor an accounting of the rate at which teams were expending them…Given the lack of tracking, the DPD is generally unable to account for the number of munitions deployed by individual teams or squad. Nor is it able to account for the total amount of each type of munition deployed during the GFP.

    (Ex. 3 at 19.)

83. Third, as discussed in paragraph 70 above, untrained and uncertified officers were given pepperball guns and ordered to use them.

84. Fourth, in its review, the OIM saw "extremely troubling" use of pepperballs. (Ex. 3 at 32.)

85. This included the DPD shooting pepperballs at people "verbally objecting to police behavior" and not physically resisting. (Ex. 3 at 32.)

86. It also included shooting pepperballs at "prohibited areas of the body," like "the head, face, and groin." (Ex. 3 at 32.)

87. Fifth, the DPD did not usually give dispersal orders before shooting less-lethal munitions.

88. DPD policy is that "dispersal orders should be given and repeated at least three times, and if possible, from a variety of locations." (Ex. 3 at 25.)

89. Nonetheless, the OIM concluded that:

    > The DPD…did not consistently issue dispersal orders before using force to disperse crowds. Community members [the OIM] spoke with during [its] review reported that they heard only sporadic dispersal orders. More often, they reported being subjected to less-lethal munitions before hearing any warning or order…[The OIM] reviewed hundreds of hours of video footage and observed dozens of situations in which the DPD used less-lethal munitions to disperse crowds. [The OIM] heard orders to disperse in only a minority of those situations. In most, the available video did not show any exigency that required the application of less-lethal munitions without orders to disperse.

(Ex. 3 at 26.)

90. This DPD custom of uncontrolled pepperball use was so pervasive that, as discussed in paragraphs 10 and 11 above, many witnesses saw officers hanging off police vehicles shooting at anything and nothing – the perverse game of cat and mouse.

91. One officer unrelated to the incident in this case was officially disciplined for shooting pepperballs at a car "driving away" from him because a passenger "was verbalizing animus toward the police." (Ex. 10 at 1.)

92. More officers should have been disciplined, but the DPD did not keep duty rosters for the first four days of the GFP, and cannot identity many of the officers involved in misconduct allegations.

93. As the OIM found:

> The DPD opened more than 100 investigations into complaints alleging misconduct by DPD officers during the GFP. Although many of those investigations were not completed at the time of [the OIM] report, of the 56 complaints closed, 20 were declined for further investigation and review due, in part, to an inability to identify the subject officer. That is, the complainant did not provide the officer's identifying information in the complaint, and the investigation did not reveal it further. These declined complaints contained potentially serious allegations, *such as officers firing pepperball rounds into a car of people trying to leave the GFP*.

(Ex. 3 at 27-28, emphasis added.)

94. Each feature of this DPD custom of extreme pepperball use was part of the incident involving Plaintiffs.

95. The incident began, for example, when an officer shot at Plaintiffs' car randomly and without provocation.

96. Mr. Brown only verbally protested before being shot.

13

97. Officers did not give any dispersal orders.

98. Officers fired a huge and excessive number of pepperballs, including when Plaintiffs were trying to drive away.

99. These rounds targeted Mr. Brown's face and Ms. King's pregnant abdomen.

## FIRST CLAIM FOR RELIEF

**(Fourth Amendment Excessive Force Under 42 U.S.C. § 1983, Against the Individual Defendants)**

100. Paragraphs 1 through 99 are incorporated herein by reference.

101. The individual defendants are all DPD officers and supervisors, and acted under color of law in that role during the incident in this case.

102. The individual defendants intentionally shot pepperballs at Plaintiffs.

103. The pepperballs were physical force and a show of authority that restricted Plaintiffs' liberty and freedom of movement.

104. For example, one pepperball broke Ms. King's hand. The pepperballs' impact caused Mr. Brown and Ms. King severe pain. Both Plaintiffs suffered choking and extreme difficulty breathing and seeing.

105. The individual defendants' actions thus effected a seizure of Plaintiffs.

106. This seizure was objectively unreasonable for reasons including but not limited to the following:

107. Plaintiffs had not committed any crime.

108. Plaintiffs were not suspected of having committed any crime.

109. Plaintiffs were unarmed.

110. During the incident, Ms. King never said a word and never got out of the car.

111. Mr. Brown was approximately 40 feet from officers and never approached them at any time during the incident.

112. Mr. Brown did nothing that was physically aggressive.

113. Officers gave no dispersal warning before shooting.

114. Officers shot at Mr. Brown merely because he verbally protested police.

115. Mr. Brown repeatedly told officers that Ms. King was pregnant.

116. Officers shot at Mr. Brown's face and at Ms. King's pregnant abdomen, and also broke Ms. King's hand.

117. Officers shot a huge and excessive number of pepperballs at Plaintiffs.

118. Officers continued shooting pepperballs after Plaintiffs were in the car and trying to drive away.

## SECOND CLAIM FOR RELIEF

### (Fourth Amendment Excessive Force Under 42 U.S.C. § 1983, Against Denver)

119. Paragraphs 1 through 118 are incorporated herein by reference.

**Failure to Train**

120. The DPD did not train its officers in responding to mass protests.

121. The DPD did not train its officers in responding to protests about policing.

122. During the GFP, the DPD gave officers little to no briefing, training, or direction on tactical or strategic goals.

123. The DPD ordered officers at the GFP to shoot pepperballs without those officers being trained or certified to do so.

124. These failures to train were the moving force behind Plaintiffs' Constitutional injuries.

**Policy**

125. DPD policy lets officers shoot pepperballs directly at people merely for disrupting vehicle traffic.

126. This policy was the moving force behind Plaintiffs' Constitutional injuries.

**Custom**

127. The DPD's custom during the GFP was "shoot a lot of pepperballs, shoot them often, and aim them anywhere, everywhere, and nowhere."

128. This custom was shown in the DPD stockpiling huge amounts of pepperballs, not tracking officers' use of pepperballs, ordering uncertified and untrained officers to shoot pepperballs, shooting pepperballs at people only verbally protesting police, shooting pepperballs at prohibited areas of the body, not giving dispersal orders before shooting pepperballs, and playing the perverse game of cat and mouse discussed above.

129. This policy was the moving force behind Plaintiffs' Constitutional injuries.

130. These failures to train, and this policy and custom, showed Denver's deliberate indifference to the Constitutional rights of people with whom the DPD comes into contact, including Plaintiffs.

131. Indeed, the pattern of Constitutional violations similar to what Plaintiffs experienced, and that is set forth Exhibit 1 (the court documents filed by attorney Milo Schwab) underscores the DPD's deliberate indifference to the Constitutional rights of those involved or caught in the middle of the GFP.

## THIRD CLAIM FOR RELIEF

**(First Amendment Violation Under 42 U.S.C. § 1983, Against the Individual Defendants)**

132. Paragraphs 1 through 131 are incorporated herein by reference.

133. The individual defendants are all DPD officers and supervisors, and acted under color of law in that role during the incident in this case.

134. In verbally protesting police, Plaintiffs engaged in Constitutionally protected speech.

135. DPD officers retaliated against Plaintiffs for this protected speech by shooting Plaintiffs with pepperballs.

136. As set forth throughout this Complaint, including in paragraphs 62 through 64 above, stopping Mr. Brown from voicing his protest of police was a substantial factor in officers shooting Plaintiffs with pepperballs.

137. Besides ending Mr. Brown's protest, officers had no other reason to shoot pepperballs at Plaintiffs. Again, Plaintiffs had not committed any crime, Plaintiffs were not suspected of having committed any crime, Plaintiffs were unarmed, Mr. Brown did nothing physically aggressive, Mr. Brown was approximately 40 feet from officers and never approached them, and the DPD was so tactically confused that it had no clear strategic need to remove Plaintiffs from the area.

138. The way officers retaliated would chill or silence people of reasonable firmness from continuing to protest police, and in fact stopped Plaintiffs from exercising their First Amendment rights. Indeed, Plaintiffs could barely breathe, much less protest. Instead of protesting, Ms. King needed emergency medical care for her broken hand and to try to protect her pregnancy and her unborn child.

## FOURTH CLAIM FOR RELIEF

### (First Amendment Violation Under 42 U.S.C. § 1983, Against Denver)

139. Paragraphs 1 through 138 are incorporated herein by reference.

140. Paragraphs 120 through 131 above apply equally to Plaintiffs' Fourth Amendment Claim and Plaintiffs' First Amendment claim. These paragraphs are incorporated and reiterated herein in their entirety.

….

**WHEREFORE,** on each of the claims above Plaintiffs request that this Court enter judgment against defendants for damages, costs, reasonable attorney fees, any interest recoverable by law, and such other relief as this Court deems proper.

Dated: August 2, 2021

*s/ Scott Melin*
**Scott Melin**
Bagley Law Firm, LLC
215 S. Wadsworth Blvd., Ste. 410
Lakewood, CO 80226
Telephone: (720) 378-5121
E-mail: scott.melin@bagleylawfirm.com
Attorneys for Plaintiffs